**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

JOHN DOES 37-66,

        Plaintiffs,

   v.

THE OHIO STATE UNIVERSITY,

        Defendant.

Case No. _____

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiffs John Does 37-66 file this Complaint against Defendant, The Ohio State University ("OSU" or the "University"). This is a companion case to *Michael DiSabato and John Does 1-36 v. The Ohio State University*, Case No. 2:19-cv-02237 and also has common issues of law and fact with Cases 2:18-cv-692 and 2:18-cv-736. Plaintiffs believe this case is appropriate for consolidation this case with the foregoing cases pursuant to its March 15, 2019 Order, ECF No. 69, 2-18-cv-692.

Plaintiffs allege that Defendant violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, as follows:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1334 because Plaintiffs allege claims under federal law, specifically Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

2. Venue is proper in the Southern District of Ohio pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Plaintiffs' claims occurred within this district.

<u>PRELIMINARY STATEMENT</u>

3.      Plaintiffs bring this civil rights lawsuit under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* because OSU had actual notice of and was deliberately indifferent to the fact that Richard Strauss, M.D., an OSU employee, tenured faculty member, and the Associate Director of OSU's sports medicine program, sexually assaulted and abused hundreds of male OSU student-athletes and other male OSU undergraduates throughout his almost twenty-year career with the University.  OSU officials not only had actual notice of Strauss's criminal and unlawful actions, they aided, abetted, and actively concealed Strauss' sexual predation on OSU's students.

4.      As a threshold matter, Plaintiffs admit they consented to receiving legitimate medical treatment on the occasions they were sexually assaulted, abused, or subjected to sexual harassment.  Plaintiffs, however, did not consent to Strauss doing or saying anything that was medically unwarranted, inappropriate, or unethical.  For numerous reasons described below, Plaintiffs were not in a position to judge how far Strauss deviated from the standard of care when treating them.  Also, OSU sent the Plaintiffs to Strauss for treatment.  They did not select him as their medical provider.

5.      Strauss abused Plaintiffs during pre-season physicals and when treating them for injuries, either through the OSU Athletics Department or OSU's Sports Medicine Clinic at Student Health Services. He also sexually harassed student-athletes in the locker rooms and showers of Larkins Hall, where many teams were based, including wrestling, gymnastics, swimming, and fencing.

6.      On information and belief, OSU assigned Strauss a locker in *every room* used by male athletes for the teams based in Larkins Hall.

7.     OSU designated Strauss as a team physician for many sports.  Plaintiffs could not avoid him if they were sent to him and they wanted prompt medical treatment.  OSU funneled Plaintiffs and other student-athletes and undergraduates to Strauss with assembly-line efficiency, whereupon Strauss cornered and sexually assaulted them. He sexually assaulted/abused most of the Plaintiffs more than once, and some wrestlers between 20-50 times.

8.     OSU concealed, intentionally ignored, or disregarded athletes' repeated reports and other widely known information that indicated Strauss was a threat to his male patients.  A Graduate Assistant Trainer who overlapped with Strauss only one academic quarter noticed "immediately" that something was "off" with Strauss.  "In her view, individuals who overlapped with Strauss for any significant period of time would have had to have their 'ear plugged, eyes shut, and mouth closed not to realize something was off.'" *Sexual Abuse Committed by Dr. Richard Strauss at The Ohio State University*, Report of Perkins Coie, LLP, May 15, 2019, p. 104 ("Report"). Officials turned a blind eye to numerous red flags that Strauss was sexually abusing his patients, such as: Strauss insisted upon examining patients without any other staff being present, including students in training; Strauss performed notoriously long and thorough "hernia checks" during team physicals; athletes' openly commented on the fact that Strauss made them drop their pants regardless of their medical needs (e.g., to get a case of cauliflower ear treated); and the fact that Strauss showered with athletes from multiple teams, often took multiple showers a day, and requested (and received) multiple lockers in Larkins Hall.

9.     There were other clear signs of Strauss' predatory behavior. When teams reported for pre-season physicals, Athletics Department personnel set up stations for each station of the physical. Strauss always chose to man the "hernia check" station.  He took an extended amount of time with each athlete patient and examined each patient in a room with the door closed.

Strauss' "hernia checks" frequently took several minutes. Some lasted as long as ten or fifteen minutes. A line would form outside of Strauss' exam room as the athletes completed the other stations for their physicals and anxiously waited for Strauss to exam them. Strauss' prolonged genital exams were well-known to the athletes he examined, Athletics Department personnel, and team coaches. At least one team head coach requested that someone other than Strauss conduct the hernia checks for team physicals because team members complained so much about Strauss' methods.

10.     Strauss disguised his sexual assaults in the context of medical examinations. He frequently positioned Plaintiffs so that his face was at the same height as their crotches. Strauss placed his face so close to his patients that they could feel his breath on their genitals. Other times he had them sit on a bench and spread their legs; then he would roll across the floor on a wheeled stool and stick his face deep between their legs to perform his exam. Sometimes Strauss donned a headlamp and turned off the room lights before putting his head inches away from patients' penises. When Plaintiffs questioned Strauss' practices, he came up with many different medical explanations. Hernia and lymph node checks were a common explanation. When one Plaintiff asked Strauss to explain the room lights off/headlamp behavior, Strauss said he was checking for skin rashes and STDs. He assured the Plaintiff that this technique allowed him to perform the best possible examination for those kinds of problems.

11.     Strauss also sexually assaulted students by performing anal and rectal exams that were excessive, lengthy, and medically unnecessary. Although less common than genital exams, they occurred frequently. They were profoundly embarrassing and humiliating to the Plaintiffs who endured them. Numerous Plaintiffs were assaulted in this manner.

12.     Some of the Plaintiffs and other student-athletes reported Strauss' examination methods to team trainers – particularly football trainer Billy Hill. While precise responses differed, the gist was almost always the same: it was not a big deal; Strauss did things his way; Strauss was just being thorough; and/or this had gone on for years.  Other benign explanations were offered. Some Plaintiffs came to believe that Strauss' examinations were a  necessary part of their participation in intercollegiate athletics that was like a "hazing."

13.     In April 2018, OSU authorized the law firm of Perkins Coie, LLP to investigate whether Strauss had sexually abused student-athletes, and if so, the extent to which OSU knew about Strauss' conduct. Perkins Coie, LLP conducted its investigation and issued the Report on May 15, 2019.  The Report substantiates many of the allegations made by Plaintiffs in this case and in other Title IX cases presently pending before this Court.[1] *See, e.g., Brian Garrett et. al. v. The Ohio State University*, Case No. 2:18-cv-00692-MHW-EPD (S.D. Ohio); *Steve Snyder-Hill et. al. v. The Ohio State University*, Case No. 2:18-cv-00736-MHW-EPD.

14.     John Does 37-66 have filed anonymously in this action due to the highly personal nature of the circumstances giving rise to their claims.

15.     Plaintiffs take no pleasure in bringing this lawsuit. OSU is an esteemed institution of higher learning, and a majority of the Plaintiffs love OSU dearly and remain devoted members of The Buckeye Nation.

16.     Plaintiffs were honored to represent OSU in competitive sports and did their best to continue the University's tradition of excellence.

---

[1] Materials received from Ohio's Medical Board Contents are redacted from the current version of the Report.

17. Plaintiffs attended OSU expecting the University would consistently provide them with a safe and supportive environment that would help them perform at their best, both athletically and academically.

18. Plaintiffs believed that OSU would make patient/athlete safety one of the University's primary concerns.

19. Team physicians hold a special relationship of trust and confidence with the student-athletes they treat.

20. Plaintiffs trusted OSU to act in their best interests when selecting, training, and supervising the team physicians on its faculty.

21. Plaintiffs trusted OSU to hire physician faculty members who would respect and honor the relationship of trust and confidence that must be present between patients and their physicians.

22. Plaintiffs trusted OSU to regularly and competently evaluate the quality and integrity of the medical services Strauss provided to Plaintiffs.

23. Plaintiffs trusted OSU to investigate faithfully all circumstances that indicated a team physician was unfit to treat Plaintiffs, whether due to acts of sexual assault/abuse or incompetence.

24. Plaintiffs trusted that OSU personnel would not hide, fail to disclose, or disregard known circumstances that raised a substantial likelihood the Plaintiffs or other students and student-athletes were being sexually assaulted, abused, or harassed by Strauss and/or by conditions at Larkins Hall.

25. Plaintiffs expected OSU, an esteemed institution of higher learning, to investigate the truth about Strauss' conduct in a timely and competent manner, regardless of how unfavorable findings might affect the University's reputation or athletics programs.

26. Plaintiffs relied on OSU to confront and stop Strauss' sexual abuse of Plaintiffs and other male OSU students.

27. Plaintiffs relied on OSU to stop the rampant sexual harassment that student-athletes, particularly the wrestling team, had to endure in Larkins Hall between 1978 and 1998.

28. OSU betrayed Plaintiffs' trust and utterly failed to meet the legal and ethical obligations it owed to Plaintiffs and other OSU students. At all times relevant to this Complaint, OSU officials with authority to institute corrective measures actively concealed, failed to disclose, and showed deliberate indifference towards circumstances that indicated Strauss was sexually assaulting and abusing many male OSU athletes he treated.

29. On information and belief, OSU personnel failed to implement corrective measures despite having actual knowledge of: (a) a substantial or high likelihood that Strauss was sexually assaulting/abusing students, and (b) the sexually hostile environment Larkins Hall presented to athletes on the teams housed there . Such OSU personnel included (but were not limited to) Athletic Directors and Assistant Athletic Directors, Head Team Physicians, and team physicians (who were also faculty members).

30. At all times relevant to this Complaint, OSU maintained a culture of concealment, denial, and unwillingness to investigate sexual abuse and sexual harassment of male athletes at the University. This culture led to OSU's active concealment of and deliberate indifference towards continuing complaints and reports about Strauss' behavior and the conditions at Larkins Hall. Consequently, Strauss remained hidden in plain sight and continued to abuse Plaintiffs and

other patients throughout his career at the University. Plaintiffs on teams housed in Larkins Hall continued to be harassed on a daily basis. Both of these threats to student safety remained unabated for approximately twenty years.

31.     Only within the past two years have Plaintiffs realized that Strauss' conduct constituted sexual assault or sexual abuse.

32.     Only within the past two years have Plaintiffs had a reasonable basis for believing that OSU knew of the risk Strauss likely presented to the student-athletes he treated before, during, and after he assaulted/abused/harassed Plaintiffs.

33.     Only within the past two years have Plaintiffs had a reasonable basis for believing OSU intentionally concealed or showed deliberate indifference to the threat Strauss posed to them.

34.     Only within the past two years have the Plaintiffs who competed in wrestling, gymnastics, swimming, and fencing had reason to know that OSU administrators in a position to take corrective measures had actual knowledge of the sexually harassing environment male athletes endured on a daily basis in Larkins Hall.

35.     Even if Plaintiffs had realized more than two years ago that Strauss' conduct constituted sexual assault and sexual abuse, Plaintiffs would have had no reasonable basis for alleging or concluding that OSU harmed them separately and independently from the harm Strauss inflicted on them.  Strauss harmed Plaintiffs by sexually assaulting and abusing them. By contrast, OSU separately and independently harmed Plaintiffs by failing to protect them from Strauss despite knowing Strauss was substantially likely to be a sexual predator.  Not until within the past two years would Plaintiffs' due diligence have allowed them to reasonably infer: (a)

what OSU knew about Strauss while Strauss was on the faculty; or (b) what OSU did or failed to do with that information.

36. Likewise, not until within the past two years would the Plaintiffs whose teams practiced in Larkins Hall, including wrestling, swimming, gymnastics, and fencing have known: (a) the extent of OSU's institutional knowledge about the conditions in Larkins Hall; or (b) what OSU did or failed to do with that information.

<u>THE PARTIES</u>

37. Defendant The Ohio State University was at all relevant times and continues to be a public university organized and existing under the laws of the State of Ohio.

38. Defendant OSU receives, and at all relevant times received, federal financial assistance. Defendant is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq.*

39. Plaintiffs were enrolled at OSU as students during Strauss' employment with OSU.

40. Plaintiffs participated in OSU intercollegiate sports teams while enrolled at OSU.

41. Plaintiffs received financial assistance from OSU that was linked to their participation on OSU's intercollegiate sports teams.

42. Plaintiff John Doe 37 is a resident of the State of Texas. He attended OSU from 1987-1989 and wrestled for the University in 1997 and 1988.

43. Strauss treated John Doe 37 approximately 30 times while John Doe 37 was on the wrestling team. Every time Strauss treated John Doe 37, he required John Doe No. 37 to drop his pants and then fondled John Doe No. 37's genitals for an extended period of time.

44. John Doe No. 38 is a resident of the State of Georgia.

45.     John Doe No. 38 attended OSU from 1986-1990 and played football for OSU from 1986-1989.

46.     Strauss sexually assaulted/abused John Doe No. 38 when performing John Doe No. 38's freshman pre-season physical.  Strauss fondled John Doe No. 38's genitals for an excessive period of time.  The way he touched Plaintiff felt inappropriate, but Plaintiff had no medical basis for challenging Strauss' examination method. At the time of the examination an assistant was also in the room, but Strauss used his body to shield his actions from the assistant.

47.     John Doe No. 38 remembers one of the players saying very loudly, directly in front of several trainers, that something was "wrong" with Strauss or with the way he was performing his part of the physical examinations. The player's comment got no response from the trainers.

48.     John Doe No. 39 is a resident of the State of Ohio.

49.     John Doe No. 39 played lacrosse and attended OSU from 1989-1993.

50.     John Doe No. 39 was sexually assaulted/abused by Strauss more than five times. Strauss performed a genital exam on John Doe No. 39 every visit, including when John Doe No. 39 sought treatment for a chest infection.  The genital exams were excessive and/or unnecessary.

51.     John Doe No. 39 witnessed Strauss loitering in the showers as the lacrosse players showered after practice.  Strauss invited Plaintiff and other lacrosse players out for dinner after practices.

52.     John Doe No. 40 is a resident of the State of Ohio.

53.     John Doe No. 40 attended OSU from 1994-1998 and played golf for the University. John Doe No. 40 saw Strauss for treatment on two occasions and was sexually

abused both times. Strauss conducted long genital exams of Plaintiff. Strauss conducted the exams with his eyes at the level of Plaintiff's genitals. Strauss did not wear gloves. Plaintiff asked if Strauss was "done" because they took so long. On one occasion, Strauss performed a medically unnecessary and excessive genital exam on John Doe No. 40 when John Doe No. 40 sought treatment for a cold, strep throat, or something similar.

54.     John Doe No. 41 is a resident of the State of Ohio.

55.     John Doe No. 41 attended and played football for OSU from 1997-2001. Strauss treated John Doe No. 41 about four times. Strauss sexually assaulted/abused John Doe No. 41 every time he treated John Doe No. 41. Strauss sexually assaulted/abused John Doe No. 41 by conducting very lengthy and excessive genital exams and requiring John Doe No. 41 to get completely naked regardless of why John Doe No. 41 was requesting treatment.

56.     John Doe No. 42 is a resident of the State of Ohio. John Doe No. 42 attended OSU from 1997-2992 and played football for the University.

57.     John Doe No. 42 saw Strauss three times and was sexually assaulted/abused on every occasion. Strauss groped John Doe No. 42's genitals and penetrated his anus under the ruse of performing a rectal examination.

58.     John Doe No. 43 is a resident of the State of Ohio. John Doe No. 43 attended and played football for OSU between 1997-1999. Strauss sexually assaulted/abused John Doe No. 43 multiple times by touching John Doe No. 43's inner thighs, buttocks, and other areas in a manner that made John Doe No. 43 felt very uncomfortable and felt sexual rather than clinical. His genital exams were excessive and lengthy. Strauss did not wear gloves during these exams. Strauss also performed an inappropriate rectal exam on Plaintiff.

59.     John Doe No. 44 is a resident of the State of Ohio. John Doe No. 44 attended OSU from 1991-1997 and wrestled five years.

60.     Strauss sexually assaulted/abused John Doe No. 44 between twelve and fifteen times. No matter why John Doe No. 44 was seeing Strauss (e.g., a cold), Strauss would perform a genital exam.  At least five times, John Doe No. 44 saw Strauss because he was having problems with Hemorrhoids.  On those occasions, Strauss did what he purported to be an anal exam. The anal exam consisted of having John Doe No. 44 lie on his back with his legs spread and his knees up by his ears.  Strauss then rolled his chair over to the examination table, placed his face next to John Doe No. 44's anus, and rubbed on and around  John Doe No. 44's anus for minutes.

61.     John Doe No. 44 recalls Strauss showering with the team on a daily basis.  While showering, Strauss scrubbed his entire body vigorously, as a surgeon would scrub his hands before going into surgery.

62.     John Doe No. 44 also recalls being subjected to voyeurism and exhibitionism from multiple unidentified people on a daily basis.  Incidents occurred in and around the locker area, showers, and sauna.  For example, naked men in the sauna would conduct stretching exercises in a very conspicuous manner, as though intended to maximize exposure of the genitals and/or anus.

63.     John Doe No. 45 is a resident of the State of Ohio.

64.     John Doe No. 45 wrestled for OSU from 1986-1987.

65.     Strauss sexually assaulted/abused John Doe No. 45 on a regular basis.  Strauss would grope John Doe No. 45's genitals during exams and repeatedly commented on John Doe No. 45's uncircumcised penis.  Strauss also took pictures of John Doe No. 45's penis and had

John Doe No. 45 come back to Strauss' office in the back training room for "treatments." Strauss regularly asked John Doe No. 45 inappropriate questions about his penis.

66.     John Doe No. 45 told the head coach about Strauss' behavior.  The coach said he would address the situation, but nothing changed.  John Doe No. 45 became overwhelmed by Strauss' behavior and quit the team.

67.      Plaintiff John Doe No. 46 is a resident of the State of Florida.

68.     John Doe No. 46 played football for OSU from 1997-2000.

69.     Strauss sexually assaulted/abused John Doe No. 46 about five times – the same number of times that Strauss treated John Doe No. 46.

70.     Strauss had John Doe No. 46 remove his shorts every time, regardless of the complained injury.  Strauss fondled John Doe No. 46's genitals under the guise of performing genital exams.

71.     John Doe No. 47 is a resident of the State of Ohio.  John Doe No. 47 played football for OSU from 1986-1990.

72.     Strauss sexually assaulted/abused John Doe No. 47 five times.  Strauss fondled John Doe No. 47's genitals while performing extensive exams.  Strauss even performed an extensive genital exam on John Doe No. 47 when John Doe No. 47 saw Strauss in connection with a broken leg.  John Doe No. 47 complained about Strauss to the team's head trainer, Billy Hill. Nothing happened.

73.     John Doe No. 48 is a resident of the State of Ohio.

74.     John Doe No. 48 played football and attended OSU from 1993-1998.

75.     Strauss sexually assaulted/abused John Doe No. 48 on several occasions.  When checking for an injury, Strauss required a complete physical.  Strauss told John Doe No. 48 it

was precautionary, to make sure everything was still okay. After holding and groping John Doe No. 48's testicles, he would ask John Doe No. 48 whether it felt good or whether John Doe No. 48 liked it. John Doe No. 48 asked whether Strauss was done to try to make Strauss stop holding John Doe No. 48's testicles.

76.     John Doe No. 49 is a resident of the State of Nevada.

77.     John Doe No. 49 was on OSU's fencing team from 1989-1994. The fencers used the Larkins Hall facility.

78.     Strauss sexually assaulted/abused John Doe No. 49 on multiple occasions, including every time he performed a physical. Strauss fondled John Doe No. 49's penis and testicles.

79.     John Doe No. 49 told the fencing coaches about Strauss' conduct. He remembers learning that some of the female athletes had heard about Strauss' strange examination methods with male athletes.

80.     Plaintiff John Doe No. 50 is a resident of the State of Florida.

81.     John Doe No. 50 attended OSU from 1994-1999 and played football for four years.

82.     Strauss treated John Doe No. 50 four or five times. Every time Strauss treated Plaintiff, he performed a physical and hernia exam, even if he had recently performed one. To John Doe No. 50, it seemed like there was a genital exam for everything. John Doe No. 50 asked a coach why multiple physicals were needed so close in time. Nothing came of the conversation.

83.     Plaintiff John Doe No. 51 is a resident of the State of California.

84.     John Doe No. 51 attended OSU from 1985-1990 and was on the swimming team.

85.     Strauss treated John Doe No. 51 twice and sexually assaulted/abused John Doe No. 51 on one of those occasions.  Strauss fondled John Doe No. 51's testicles during a physical under the pretense of performing an extensive genital exam.  About thirty years after the examination, John Doe No. 51 remembers Strauss' exact words when manipulating Plaintiff's genitals: "It appears you have some extra room in your satchel."

86.     Plaintiff John Doe No. 52 is a resident of the State of Ohio. John Doe No. 52 played football and attended OSU from 1994-1999.

87.     Strauss saw Strauss for a physical or an injury on two or three occasions.  The last time Strauss examined John Doe No. 52, he fondled John Doe No. 52's scrotum for a long time, which was much longer than any other medical professional had ever taken when performing a genital exam.  John Doe No. 52 became concerned there was something wrong with his genitals and asked whether everything was okay.  Strauss said everything was okay.  John Doe No. 52 went out of his way to avoid seeing Strauss ever again.

88.     John Doe No. 53 is a resident of the State of Ohio.

89.     John Doe No. 53 attended OSU from 1980-1986 and wrestled for five years.

90.     John Doe No. 53 was constantly subjected to harassment and unwanted sexual behavior from unidentified men in Larkins Hall.  He repeatedly saw men masturbating in the shower, toilet stalls, and sauna. He received notes and even phone calls from men wanting sex who were using the Larkins Hall locker room and showers.  Strauss showered with the team on a daily basis.

91.     John Doe No. 53 discussed the shower area environment with the Head Coach for Wrestling.  The Coach said he had addressed the matter with the administration.  Apparently,

nothing had come from the Coach's complaint(s). It was very apparent to John Doe No. 53 that he had to pay tolerate the conditions in Larkins Hall if he wanted to wrestle for OSU.

92. John Doe No. 53 received counseling, and part of that counseling involved learning how unwanted sexual advances can impact people and create a traumatic response.

93. John Doe No. 54 is a resident of the State of Indiana.

94. John Doe No. 54 was on the track and cross-country teams and attended OSU from 1980-1983.

95. Strauss treated John Doe No. 54 one time and sexually assaulted/abused John Doe No. 54 on that occasion. John Doe No. 54 was sent to Strauss' faculty office about a hip injury. Strauss had John Doe No. 54 undress completely in the office. He then touched John Doe No. 54's groin and hip crease for an extended period of time.

96. John Doe No. 55 is a resident of the State of Texas.

97. John Doe No. 55 attended OSU from 1985-1990 and was on the fencing team for four years.

98. Strauss sexually assaulted/abused John Doe No. 55 on one of the three occasions that John Doe No. 55 sought treatment from Strauss. During a physical, Strauss touched John Doe No. 55's genitals for longer than what John Doe No. 55 thought might be required. Strauss also examined John Doe No. 55's penis extensively and commented on John Doe No. 55 not being circumcised. He asked John Doe No. 55 where he was born and said it was rare for someone to be uncircumcised from that part of the country.

99. John Doe No. 56 is a resident of the State of Ohio.

100. John Doe No. 56 played football for OSU in 1993 and 1994.

16

101.    Strauss sexually assaulted/abused John Doe No. 56 on multiple occasions when John Doe No. 56 sought treatment for his asthma and for an ankle contusion. Strauss checked John Doe No. 56's genitals "for swelling" and asked whether John Doe No. 56 wore a jock strap during practice.

102.    John Doe No. 56 recalls hearing a football player say that a person "feels violated" when they come back from seeing Strauss. Team members tried to cope with Strauss' violations by making his conduct a locker room joke. John Doe No. 56 understood the group culture to be that you just did whatever the doctor told you to do.

103.    John Doe 57 is a resident of the State of Florida.

104.    John Doe 57 attended OSU from 1995-1999 and was on the football or track teams for three of those years.

105.    Strauss sexually assaulted/abused John Doe 57 more than five times by conducting excessively long examinations of John Doe 57's genitals. John Doe 57 reported Strauss' behavior to Dr. Keating, an orthopedist for OSU. John Doe No. 57 does not know what Dr. Keating did or failed to do with that information.

106.    John Doe No. 58 is a resident of the State of Ohio.

107.    John Doe No. 58 attended OSU from 1984-1989 and played soccer there for two years. Strauss treated John Doe No. 58 about twelve times. He sexually assaulted/abused John Doe No. 58 at least twice by touching John Doe No. 58 inappropriately during genital exams. Strauss also seemed to admire John Doe No. 58's physique. While touching John Doe No. 58's chest, Strauss commented that it looked like John Doe No. 58 had been working out. Strauss' exams were very "touchy-feely." John Doe No. 58 also felt uncomfortable and thought it was

"weird" that Strauss showered with the soccer team. He did not understand why Strauss would have a legitimate reason to shower with the team.

108. John Doe No. 58 also remembers Strauss taking photographs of the soccer players when they were not playing sports. He did not understand why the team doctor would photograph players.

109. John Doe No. 59 is a resident of the State of Ohio.

110. John Doe No. 59 attended OSU from 1986-1989. He was on OSU's wrestling team for a year.

111. Strauss sexually assaulted/abused John Doe No. 59 twice. When examining John Doe No. 59, Strauss took about five minutes examining John Doe No. 59's genitals. It seemed as though Dr. Strauss was trying to get John Doe No. 59 aroused. John Doe No. 59 finally told Strauss to stop. Strauss was routinely in the shower with the wrestlers. Strauss took pictures of John Doe No. 59.

112. John Doe No. 60 is a resident of the State of Ohio. He graduated from OSU in 1982. He did not play sports for the University.

113. Strauss treated John Doe No. 60 one time, at the Student Health Center, and sexually assaulted/abused John Doe No. 60 on that occasion. John Doe No. 60 was being seen for stomach pains, but Strauss had him pull down his pants and underwear. John Doe No. 60 spent several minutes aggressively manipulating John Doe No. 60's genitals. John Doe No. 60 asked how much longer Dr. Strauss was going to take. After about another minute, Strauss told John Doe No. 60 he could pull up his pants.

114. John Doe No. 60 sought counseling for the incident in 1992. He believes Strauss was trying to get him to ejaculate when he fondled John Doe No. 60 that way.

115. John Doe No. 61 is a resident of the State of Ohio.

116. John Doe No. 61 played basketball and attended OSU for four years.

117. Strauss sexually assaulted/abused John Doe No. 61 twice by fondling John Doe No. 61's genitals. When John Doe No. 61 visited Strauss for treatment of a hamstring injury, Strauss focused instead on John Doe No. 61's groin and genitals. Strauss touched John Doe No. 61's genitals for about twenty minutes under the pretext of conducting a physical.

118. John Doe No. 61 told an assistant coach about Strauss in 1992. He does not know what the coach did with the information.

119. John Doe No. 62 is a resident of the State of Ohio.

120. John Doe No. 62 played football and attended OSU from 1992-1997.

121. Strauss sexually assaulted/abused John Doe No. 62 during two preseason physicals. Strauss made uncomfortably direct eye contact with John Doe No. 62 as he waited in Strauss's line. He then touched John Doe No. 62's genitals for what seemed like an unnecessarily long time while supposedly checking for hernias. John Doe No. 62 was young and did not know how to respond; he only knew things did not feel "right" when the events occurred. John Doe No. 62 went out of his way to avoid Dr. Strauss' line from that point forward.

122. John Doe No. 62's gut instinct at the time of these events was that Strauss' contact was inappropriate, but Strauss was a doctor and John Doe No. 62 assumed he had been thoroughly vetted by OSU. He also felt like he was a "small fish" who would not be taken seriously if he complained about Strauss.

123. John Doe No. 63 is a resident of the State of Ohio.

124. John Doe No. 63 played football at OSU from 1996-1999.

125.     Strauss sexually assaulted/abused John Doe No. 63 about three times.  John Doe No. 63 recalls Strauss, during a shoulder exam, rubbing on Plaintiff's back in a way that did not feel clinical.  Strauss performed a "lymph node" check on John Doe No. 63's groin when John Doe No. 63 saw Strauss for treatment from a cold or the flu.  When Strauss performed a physical on John Doe No. 63, he made John Doe No. 63 completely undress and walk back and forth in front of him.

126.     John Doe No. 64 is a resident of the State of Ohio.

127.     John Doe No. 64 attended OSU from 1992-1997 and participated on OSU's basketball and track teams.

128.     Strauss sexually assaulted/abused John Doe No. 64 twice.  Strauss performed physical exams John Doe No. 64 felt were excessively long and intense.  Strauss groped John Doe No. 64 and grasped his genitals for extended periods during exams. Strauss also spent time examining John Doe No. 64's anus and touching John Doe No. 64 very close to his anus.

129.     John Doe No. 65 is a resident of the State of California.

130.     John Doe No. 65 was on the gymnastics team at OSU for the 1985 school year. He stayed through the summer before beginning gymnastics in order to train, and Strauss was a regular fixture in the gymnastics locker room.  Strauss would remain naked while talking to the gymnasts after practice, and he would nonchalantly touch his own genitals while talking to them. He would also stare at the gymnasts' genitals during the conversations.

131.     Strauss sexually assaulted/abused John Doe No. 65 twice. On one occasion, Strauss had John Doe No. 65 drop his pants for a physical, and then fondled John Doe No. 65's testicles for about a minute.  John Doe No. 65 asked Strauss whether Strauss was done, and

Strauss said there might be something wrong with John Doe No. 65's testicles.  Strauss was not wearing gloves.  Strauss also asked John Doe No. 65 when he had last ejaculated.

132.    On another occasion, John Doe No. 65 saw Strauss for hives.  Strauss made John Doe No. 65 drop his pants to follow-up on John Doe No. 65's testicle "problem."  When John Doe No. 65 dropped his pants, Strauss began fondling his testicles, then got down on his knees with his face next to John Doe No. 65's testicles.  John Doe No. 65 recalls seeing part of Strauss' arm moving between Strauss' legs and an expression of sexual pleasure on Strauss' face.

133.    John Doe No. 65 left OSU after one year, mainly due to Strauss.  However, he was also subjected to a physical incident in the Larkins Hall showers. As John Doe No. 65 showered, a man bumped into him.  The man's penis was erect.  John Doe No. 65 left OSU even though it had been his dream to compete in gymnastics for OSU.  He did not feel safe at the University.

134.    John Doe. No. 66 attended OSU from 1988-1993 and played baseball for the University.

135.    Strauss sexually assaulted/abused/harassed John Doe. No. 66 three times during physical examinations.  Strauss spent a great deal of time examining John Doe. No. 66's genitalia during the physicals.

136.    John Doe. No. 66 also recalls feeling Strauss' hand on his shoulder as Strauss walked behind him.  The touch felt sexually provocative.  After touching Plaintiff's shoulder in that manner, Strauss walked in front of Plaintiff and asked Plaintiff if he worked out.  The tone of the question was provocative in nature.

## STRAUSS

137.    OSU employed Richard Strauss, M.D., as a faculty member from September 1978 until March 1, 1998.

138.    In 1978, Strauss was hired as an Assistant Professor of Medicine in the Pulmonary Disease Division of the Department of Medicine.

139.    By 1980, Strauss was Associate Director of the Sports Medicine Program.  In 1981, Strauss began an appointment in the Athletics Department and expanded his clinical duties to the Sports Medicine Clinic at University Health Services.  By 1982, Strauss' primary affiliation was with the Department of Preventive Medicine.

140.    OSU granted Strauss tenure as an associate professor in 1983. OSU made Strauss a full professor with tenure in 1992.  Strauss voluntarily retired in March 1998 and was approved by the Board of Trustees for emeritus status in the School of Public Health. Emeritus status was granted without the review or approval of the Dean of the College of Medicine and Public Health. (Report, p. 32,33.)

141.    Throughout his employment, Strauss provided medical services to various OSU sports teams.  Strauss initially served as a team physician for the wrestling, swimming, and gymnastics teams, which were based at Larkins Hall.  At that time, Larkins Hall was OSU's physical education building and aquatics facility.

142.    "Over the years, Strauss' responsibilities as a team physician expanded beyond just the teams based out of Larkins, and included assignments with teams and in facilities across campus[,]" (Report at 2.) Around 1980, Strauss began treating patients at the Sports Medicine Clinic at Student Health Services. He was ultimately appointed Chief Physician of the Sports Medicine Clinic.  As time went on, Strauss treated students "who participated in a wide range of

sports including hockey, cheerleading, volleyball, soccer, track, golf, baseball, tennis, water polo, and football." (*Id.* at 35).

143.    Strauss' appointment with Student Health ended in 1996 following an investigation into student complaints about Strauss' sexual misconduct during medical exams.

<u>STRAUSS' ACTS OF SEXUAL ASSAULT AND ABUSE</u>

144.    Strauss abused Plaintiffs and OSU students in one or more of the following ways (as categorized by the Report):

a.    In the context of a medical examination that caused the student to reach ejaculation or nearly reach ejaculation;

b.    In the context of a medical examination that caused the student to reach erection or nearly reach erection;

c.    Unnecessary fondling or groping of genitals in the context of a medical examination, or medically unnecessary examinations of the genitals or rectum.

d.    Examination techniques that included: unnecessary nudity; excessive touching of non-genital/non-rectal areas of the student's body; inappropriate verbal commentary or sexually charged questioning; lack of medical gloves for genital examinations; unnecessarily invasive physical positions; medical treatment outside a clinical setting; and *quid pro quo* arrangements; and

e.    Inappropriate and sexually abusive conduct outside of the examination room, including showering alongside student-patients, loitering in student-athletes'' locker rooms and engaging in voyeuristic behavior, and initiating fraternization with patients. (Report at 40)

145.    Strauss committed these acts of sexual abuse and harassment consistently and on a daily basis throughout his career at OSU.

146.    Strauss committed these acts of sexual abuse while an OSU faculty member.

### WHY PLAINTIFFS HAD DIFFICULTY REALIZING OR REPORTING STRAUSS' CONDUCT AS SEXUALLY ABUSIVE

147.    Plaintiffs were vulnerable to Strauss' sexual abuse and many were not able to identify Strauss' conduct as sexual abuse when it occurred. Many factors caused this result, as set forth below.

148.    Almost all the Plaintiffs were treated by Strauss in his capacity as a Team Physician through the Athletics Department or at the Sports Medicine Clinic. He was the person officially designated to treat them.

149.    Almost all the Plaintiffs had to pass a pre-season physical in order to participate in their sport.

150.    Before attending OSU, some Plaintiffs had not seen a doctor without their parents being present.

151.    Plaintiffs who were student-athletes tended to attribute Strauss' surprisingly "rigorous" genital and rectal examinations to the fact that the physical requirements of intercollegiate sports were much greater than for high school competition.

152.    Plaintiffs were sexually assaulted/abused by Strauss in the context of a purported medical examination, such as when seeing him for a pre-season physical or for a sports-related injury.  They came into contact with him under legitimate circumstances and were more likely to interpret what took place in the examination room within that framework of legitimacy.

153.    When Strauss abused Plaintiffs, male sexual abuse was not a commonly acknowledged problem or a commonly discussed topic among non-educators or people outside the fields of medicine and counseling.

154.    Plaintiffs were brought up to believe that doctors are trustworthy and do not intentionally hurt their patients.

155.    Plaintiffs were brought up to believe that a "good" patient is a compliant patient.

156.    Plaintiffs treated by Strauss were placed in a vulnerable position, both physically and emotionally, when Strauss examined them. They were not psychologically predisposed to question Strauss' clinical practices.

157.    There was a huge disparity between Strauss' medical knowledge and the Plaintiffs. They had no standing to challenge his explanations for the things he did to them.

158.    Plaintiffs were on Strauss' "turf" when he examined them in his office. For Strauss' psychological and educational advantage over an athlete in the examination room was just as great as the athlete's physical advantage over Strauss would have been if they had competed against each other in the athlete's chosen sport.

159.    Plaintiffs went into exams, particularly pre-season physicals, expecting their doctors to touch them. They knew that doctors often have to touch their patients as part of their work. Plaintiffs had neither the experience nor education to know the limits of appropriate physical contact during medical examinations.

160.    Plaintiffs attended OSU believing its doctors and medical faculty would inform patients about the medical services they provided to them to the extent they were legally or ethically required to do so.

161.     Plaintiffs entered Strauss' examination rooms presuming that what went took place in a doctor's office was supposed to be confidential. Even under the most normal circumstances, Plaintiffs wanted their genital or rectal examinations to remain confidential because the such topics were embarrassing to discuss. When Strauss' examinations became overly aggressive or lingered too long in intimate areas, it made more sense for Plaintiffs to chalk a feeling that something was wrong up to them feeling unwarranted embarrassment or shame. The alternative was to accuse a tenured professor of committing sexual assault and to risk losing one's athletic scholarship or being viewed as someone who was exaggerating, whining, or complaining unnecessarily.

162.     Plaintiffs who were student-athletes maintained a special relationship with OSU because they were attending on athletic scholarships. Many needed their athletic scholarship to stay in school.  They were willing to endure Strauss' exams if that was a requirement to keep their scholarships.

163.     Plaintiffs who were athletes maintained a team mentality. No teammate wanted to complain about something he believed his other teammates were having to endure, no matter how unpleasant the experience.

164.     Some Plaintiffs feared being ridiculed and ostracized if they complained to teammates about the sexual undertones they perceived during Strauss' medical examinations and their teammates did not admit to having similar experiences with Strauss.

165.     OSU teams always compete at the highest possible level. The student-athlete plaintiffs were expected to perform at their best. That required them to make sacrifices and go the extra mile with every aspect of their training and preparation. Plaintiffs were not in a position to conclude a reputed world-class sports physician's examinations were improper just because

26

they felt "wrong" or seemed overly thorough. Plaintiffs understood Strauss to be an elite sports doctor, just like they were elite athletes. Strauss' "thoroughness" felt, extreme, embarrassing, and humiliating to the Plaintiffs, but Plaintiffs believed his physicals were a necessary part of their quest for excellence.

166. Plaintiffs, as athletes, were expected to be tough and not to complain.

167. OSU controlled every aspect of how Strauss interacted with the Plaintiffs. OSU provided the facilities, designated Strauss as their doctor, and controlled scholarships. Plaintiffs had no say in who treated them.

168. None of the Plaintiffs had/have received medical education or training, so they had/have no knowledge of medical examination techniques for diagnosing or treating hernias, swollen lymph nodes, or hamstring tears, or medical conditions of the penis, testicles, rectum, prostrate, or anus.

169. None of the Plaintiffs have been trained or educated as to what constitutes inappropriate physical conduct in the context of a doctor-patient relationship.

170. None of the Plaintiffs have ever been educated or trained regarding what comments or questions are inappropriate for a physician to make during a medical examination.

171. When Strauss sexually assaulted/abused Plaintiffs in a clinical setting, many of them felt confused as to whether abuse had, in fact, occurred. While Plaintiffs had strong negative emotions and many felt his exams were medically inappropriate, they also understood that feelings are not facts. Many of them did not appreciate until within the past two years that Strauss touched them in an unlawful manner.

172. Plaintiffs were expressly or impliedly misled by OSU trainers, coaches, and employees in the Athletics Department into believing that Strauss' sexually abusive examination

27

methods and statements, though unpleasant and embarrassing, were standard procedure and medically acceptable practices.

173.    Plaintiffs were unlikely to think Strauss was committing an act of sexual violence by manipulating their genitals for extended periods because everyone talked openly about Strauss' over-the-top Strauss' genital exams. To a young college student, how could something discussed so openly actually be a crime?  Strauss' insistence upon his rigorous genital and rectal exams became an accepted, albeit despised, part of being treated.  Plaintiffs' only recourse was to make nervous jokes about their powerlessness over their predicament. A Plaintiff recalls that during his freshman physical, teammates outside Strauss' closed examination room could be heard laughing that it was Plaintiff's "first time" – as though Plaintiff was losing his virginity.

174.    Not until within the past two years have Plaintiffs had a reasonable basis for believing OSU had actual knowledge Strauss was sexually abusing male students in a clinical setting.

175.    Not until within the past two years have Plaintiffs had a reasonable basis for believing that OSU concealed or remained deliberately indifferent to the substantial risk that Strauss was sexually abusing them and other male OSU students, particularly student-athletes.

176.    Left to their own means, Plaintiffs had no reasonable way of knowing that OSU had actual knowledge Strauss was sexually abusing male students in a clinical setting.  Plaintiffs also had no way of learning the awful truth about what OSU knew and when, or how OSU chose to permit their continued sexual abuse by Strauss. No exercise of reasonable due diligence would have revealed to them how OSU's acts and omissions caused Plaintiff to suffer independent injuries from the injuries caused by Strauss.

### OSU'S DELIBERATE INDIFFERENCE TOWARDS STRAUSS' CONDUCT

177.     "Beginning as early as Strauss' first year at OSU – and persisting throughout his nearly two decades at the school – students and University staff reported and referred complaints about Strauss to various University employees." (Report at 2).

178.     On information and belief, at all times relevant to this Complaint, persons with the authority to cut-off Strauss' access to patients, to prevent Strauss from sexually abusing patients in a clinical setting, or to implement other corrective measures had actual knowledge there was a substantial likelihood that Strauss was sexually assaulting and abusing male student-athletes and other male OSU students.

179.     As early as 1979, OSU officials with authority to institute corrective measures had information indicating that Strauss posed "a substantial risk of sexual abuse" to male athletes on OSU's intercollegiate sports teams.  Among other things, "[p]ersonnel in the University's Sports medicine program and Athletics Department were aware that Strauss was conducting genital examinations on male athletes that were unusually prolonged, and that Strauss refused to allow athletic training staff to be present for these protracted genital examinations." (Report at 2)

180.     Through administrators, faculty, and staff, OSU had actual notice of Strauss' sexually abusive conduct. OSU, however, dismissed, disregarded, minimized, refuted, denied, silenced, and even concealed complaints about Strauss' sexual misconduct.  At best, OSU chose not to act on information that alerted University faculty, staff, and administrators to a substantial risk that Strauss was sexually abusing Plaintiffs and other male OSU students, particularly athletes. On information and belief, OSU personnel who were alerted to compelling evidence of Strauss' sexually predatory conduct, but failed to take meaningful action that could have prevented Plaintiffs' injuries, include: Athletic Directors, Assistant Athletic Directors and

Associate Athletic Directors; and Head Team Physicians and several team physicians (who were also faculty members).

181.    As early as 1979, personnel in the Athletics Department and in the University's Sports Medicine Program knew that Strauss conducted prolonged genital examinations on male students and refused to allow any OSU personnel to witness the examinations. Such personnel also knew "that Strauss showered alongside the male students at Larkins Hall – a practice unique to Strauss among the other team physicians and a practice that the student-athletes repeatedly complained about to their coaches." (Report at 2)

182.    Additionally, nurses at Student Health Services worried that Strauss was engaging in sexual conduct with patients because he often showed up unannounced to treat patients not on the schedule, took unusually long times examining them, conducted examinations behind closed doors, and failed to fill out medical records documenting the medical services he provided.

183.    Strauss was never disciplined for failing to create or complete medical records, even though such records are standard medical practice and important to providing continuity of care.

184.    By failing to insist that Strauss properly document all patient encounters, OSU made it easy for Strauss to lie about every aspect of what took place during patient visits, or even to deny that he had treated a particular student.

185.    OSU never told Strauss to stop showering with the athletes.

186.    OSU never ordered Strauss to have a third person in the room whenever he was treating a male patient.

187.    OSU did not diligently follow up on any of the rumors or reports regarding Strauss until 1994.

188.     At all relevant times, OSU also did not have a meaningful complaint or dispute resolution process for allegations of faculty sexual harassment or abuse.  On information and belief, OSU's faculty dispute procedure instructed complainants to try attempt an informal resolution, i.e., a mediation, with the faculty member at issue before going through other channels. It made no sense to recommend that victims of sexual abuse and harassment try to negotiate a resolution with their abusers before seeking formal redress.

189.     At the end of the day, OSU failed the Plaintiffs and Strauss' other victims in every imaginable way. It effectively gave Strauss a green light to prey upon male OSU students as he saw fit.  Strauss took full advantage of every opportunity OSU gave him to assault, abuse, and harass Plaintiffs and other male OSU students.

## CONDITIONS AT LARKINS HALL

190.     During the Strauss years, Larkins Hall was in and of itself a constant source of sexual harassment for the male members of the athletics teams based inside it. Larkins Hall was home to a number of OSU sports teams, including wrestling, gymnastics, and swimming.  While Strauss participated in the sexual harassment that took place in Larkins Hall, he did not independently create the sexually hostile environment that affected the Plaintiffs.

191.     All male university faculty and students were allowed to use the same showers as the wrestling team.  An aggressively voyeuristic culture developed where certain non-athletes showered at the same time as wrestlers and soaped their groins vigorously while watching the wrestlers shower.  These individuals, including Strauss, leered at the wrestlers while watching them shower. The voyeurs often stayed in the showers until all the wrestlers had finished – often for an hour or longer.  Some of these individuals were OSU faculty. When the wrestling team

changed its practice time, many of the voyeurs shifted their shower times to coincide with the wrestling team's new schedule.

192.    Wrestlers were frequently approached in the bathroom and showers and propositioned for sexual encounters.  One Plaintiff even had notes put in his locker asking him to meet up for sex.

193.    The harassment was so constant that one wrestler called getting to and from the showers "running the gauntlet."

194.    The wrestling room and spaces around it, including the bathroom and a stairwell, became a popular hangout for sexual encounters. Coach Hellickson found people having sex in a bathroom stall, in a stairwell, in the wrestling room, and in other areas. It was not uncommon for Hellickson to see people engaging in sexual activity inside Larkins Hall.

195.    One of the Plaintiffs, a wrestler, was sexually assaulted by a man who grabbed and tried to fondle him as the wrestler was showering. The resulting physical confrontation worried Hellickson about the possibility things might get violent in the future. Larkins Hall was not a safe space for the male athletes who shared lockers or facilities with non-team members.

196.    Hellickson repeatedly complained to OSU administrators about the environment in Larkins Hall because the conditions seriously impacted the psyche and morale of his wrestlers.

197.    Hellickson requested a separate team shower area. OSU denied his request.

198.    Hellickson begged to have the  wrestling team moved to another building. OSU denied his request.

199.    When Hellickson tried to get people to leave because they were ogling the wrestlers and taking hour-long showers, they said it was their right to shower when and for as

long as they wanted. They denied staring at the wrestlers. University police would not make them leave.

200. Larkins Hall became an unsafe space and sexually hostile environment for wrestlers and some of the other male athletes whose teams were based there.

**CLAIM FOR RELIEF**
**COUNT I: Violation of Title IX**
**20 U.S.C. § 1681(a),** *et seq.*
**Heightened Risk Claim**

201. Plaintiffs incorporate by reference the allegations in all previous paragraphs as if fully stated here.

202. Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."

203. Title IX is implemented through the Code of Federal Regulations. See 34 C.F.R. Part 106. 34 C.F.R. § 106.8(b) provides: ". . . A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part."

204. As explained in Title IX guidance issued by the U.S. Department of Education's Office for Civil Rights, sexual harassment of students is a form of sex discrimination covered by Title IX.

205. Sexual harassment is unwelcome conduct of a sexual nature, including unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.

206.    Title IX covers all programs of a school that receives any federal financial assistance, and covers sexual harassment—including sexual assault—by school employees, students, and third parties.

207.    At all relevant times, OSU received federal financial assistance and is therefore subject to Title IX.

208.    Title IX required OSU to promptly investigate all allegations of sexual harassment, including sexual assault and abuse.

209.    Strauss committed his unlawful acts while working for OSU as a tenured faculty member, Team Physician, and Sports Medicine Physician.

210.    Strauss's sexual assault, abuse, molestation, and harassment of Plaintiffs—which included, among other things, fondling their testicles, fondling their penises, digitally penetrating their rectums, rubbing his erect penis on their bodies, and making inappropriate sexualized comments—was sex discrimination under Title IX.

211.    OSU was required to promptly investigate and address Plaintiffs' (and other OSU students') allegations, reports and/or complaints of sexually abusive or harassing behavior by Strauss.

212.    OSU had actual knowledge of the serial sexual assault, abuse, and molestation committed by Strauss.

213.    Specifically, OSU knew about Strauss's sexual assault, abuse, and molestation through OSU personnel with authority to take corrective action to address it. Such personnel included but were not limited to: Athletic Directors and Assistant Athletic Directors, and Head Team Physicians and several team physicians (who were also faculty members).

214. Throughout Strauss's 20-year tenure at OSU, students, student-athletes, and coaches conveyed complaints and concerns to OSU administrators and employees about Strauss's inappropriate sexual conduct.

215. Given the magnitude of Strauss's abuse—involving students and student-athletes he evaluated and treated over two decades—it would be implausible for OSU to claim that it did not know about Strauss's sexual abuse.

216. Nonetheless, OSU did not address the complaints and concerns about Strauss.

217. OSU's failure to respond promptly and adequately to allegations of Strauss's abuse constitutes sex discrimination in violation of Title IX.

218. By its acts and omissions, OSU acted with deliberate indifference to the sexual abuse and harassment that Plaintiffs and other male OSU students were experiencing. OSU's deliberate indifference included, without limitation:

    a. Failing to respond to allegations of Strauss' sexual assault, abuse, and molestation;

    b. Failing to promptly and adequately investigate allegations of Strauss's sexual assault, abuse, and molestation;

    c. Requiring male athletes to see Strauss for annual physicals and medical treatment, despite widespread knowledge and complaints about Strauss's behavior;

    d. Allowing Strauss (and other sexual predators) to roam freely in Larkins Hall;

    e. Allowing Strauss to work as a physician in Student Health Services, despite widespread knowledge and complaints about Strauss's abuse of male student-athletes;

f.  Failing to discharge or adequately supervise Strauss after learning that he posed a substantial risk to the safety of male students and student-athletes;

g.  Failing to require that Strauss properly document all patient encounters;

h.  Failing to take corrective action to prevent Strauss from sexually assaulting, abusing, and molesting students; and

i.  Failing to have in place an effective sexual harassment policy that allowed students to bring complaints without first having to try to resolve complaints of sexual harassment informally with the alleged abuser.

219.    OSU's failure to promptly and appropriately investigate, remedy, and respond to complaints about Strauss's sexual misconduct caused Plaintiffs (and other male OSU students) to experience further sexual harassment and/or made them liable or vulnerable to it.

220.    OSU's failure to promptly and appropriately investigate, remedy, and respond to complaints about Strauss's sexual misconduct created a sexually hostile environment that effectively denied Plaintiffs access to educational opportunities and benefits at OSU, including appropriate medical care.

221.    As a direct and proximate result of OSU's violation of Plaintiffs' rights under Title IX, Plaintiffs have suffered and continue to suffer emotional distress, physical manifestations of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame, humiliation, loss of self-esteem, and loss of enjoyment of life; were prevented and continue to be prevented from obtaining the full enjoyment of life; have sustained and continued to sustain loss of earnings and earning capacity; and have incurred various personal expenses.

## COUNT II: Violation of Title IX
## 20 U.S.C. § 1681(a), *et seq.* Hostile Environment

222.     Plaintiffs incorporate by reference the allegations in all previous paragraphs as if fully stated here.

223.     Plaintiffs whose teams were based out of Larkins Hall between 1978 and 1998 (collectively "Larkins Plaintiffs") were entitled to use the athletics facilities free from sexual harassment.  However, the pervading and constant sexual harassment they received within Larkins Hall created a hostile environment. The hostile environment these Larkins Plaintiffs suffered in Larkins Hall facilities was so severe, pervasive, and objectively offensive that it effectively barred said the Larkins Plaintiffs from access to numerous educational opportunities and benefits, including but not limited to: full use and enjoyment of practice facilities, showers, and locker rooms; and full use and enjoyment of their athletic scholarships and memberships on OSU's sports teams.

224.     The sexually hostile environment inside Larkins Hall during the aforementioned period constituted sex discrimination in violation of Title IX.

225.     Between 1978 and 1998, OSU officials in a position to implement corrective measures had actual knowledge that the Larkins Plaintiffs and other male OSU student-athletes were being subjected to a sexually hostile and abusive environment inside Larkins Hall.

226.     OSU owed the Larkins Plaintiffs a duty to investigate and remedy the conditions that made Larkins Hall a sexually hostile and abusive environment.

227.     Such OSU officials showed deliberate indifference towards the safety of the Larkins Hall Plaintiffs and other male student-athletes who used the Larkins Hall facilities between 1978-1998.

228.    OSU violated Title IX by failing to remedy the sexually hostile and abusive environment in Larkins Hall.

229.    As a direct and proximate result of OSU's violation of the Larkins Plaintiffs' rights under Title IX, the Larkins Plaintiffs have suffered and continue to suffer emotional distress, physical manifestations of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame, humiliation, loss of self-esteem, and loss of enjoyment of life; were prevented and continue to be prevented from obtaining the full enjoyment of life; have sustained and continued to sustain loss of earnings and earning capacity; and incurred various personal expenses.

WHEREFORE, Plaintiffs respectfully request that this Court:

(a)     Enter judgment in favor of Plaintiffs on their claim for discrimination under Count I Title IX against Defendant The Ohio State University;

(b)     Enter judgment in favor of the Larkins Plaintiffs on their claim for discrimination under Count II Title IX against Defendant The Ohio State University;

(c)     Declare Defendant The Ohio State University's conduct in violation of Title IX of the Education Amendments of 1972;

(e)     Award Plaintiffs compensatory damages in amounts to be established at trial, including, without limitation, payment of Plaintiffs' medical and other expenses incurred as a consequence of the sexual abuse and/or harassment and The Ohio State University's deliberate indifference; damages for deprivation of equal access to the educational opportunities and benefits provided by The Ohio State University; and damages for past, present and future emotional pain and suffering, ongoing mental anguish, loss of past, present and future enjoyment of life, and loss of future earnings and earning capacity;

(f)      Award Plaintiffs pre-judgment and post-judgment interest;

(g)      Award Plaintiffs their court costs and expenses, including attorney's fees,

pursuant to 42 U.S.C. § 1988(b); and

(h)  Grant such other relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Michael L. Wright*
**Michael L. Wright (0067698)**
**Wright & Schulte, LLC**
130 W. 2nd Street, Suite 1600
Dayton, OH
(937) 435-7500
(937) 435-7511 facsimile
mwright@yourohiolegalhelp.com
*Counsel for Plaintiffs*

*/s/ Dennis P. Mulvihill*
**Dennis P. Mulvihill (0063996)**
**WRIGHT & SCHULTE, LLC**
23240 Chagrin Blvd., Suite 620
Cleveland, OH 44122-5468
(216) 591-0133
(216) 591-0622 facsimile
dmulvihill@yourlegalhelp.com

*/s/ Richard W. Schulte*
**Richard W. Schulte (0066031)**
**WRIGHT & SCHULTE, LLC**
865 S. Dixie Dr.
Vandalia, OH 45377
937-435-9999
937-435-7511 facsimile